COAL DISTRICT POWER COMPANY *v.* KATY COAL COMPANY.

Opinion delivered December 22, 1919.

1. ELECTRICITY—CONTRACT TO SUPPLY POWER—IMPOSSIBILITY OF PERFORMANCE.—Where a power company agreed to provide such electric power as might be required for a certain purpose, it was no defense to a failure to furnish such service that certain supplies could not be procured by reason of war.

2. ELECTRICITY—CONTRACT TO FURNISH—DAMAGES.—Where a power company agreed to furnish current to operate a coal mine, and by reason of its failure to do so the mine was closed, the power company was liable for the net profits that would have been made if the mine had not been closed.

3. ELECTRICITY — CONTRACT TO FURNISH — ELEMENTS OF DAMAGES.—Where plaintiff was compelled to close his mine and to operate under difficulties by defendant's failure to furnish current at all times as agreed, he was not entitled to damages for loss of profits and also to money paid for excessive cost of operation, as operating costs should be taken into account in ascertaining loss of profits upon the production of coal.

4. APPEAL AND ERROR—MATTER NOT CONSIDERED BELOW.—The Supreme Court will not render judgment for an item of damages not submitted to the jury.

5. ELECTRICITY—DAMAGES—LOSS OF PROFITS.—In an action by a mine owner against a power company for damages caused by closing the mine by reason of defendant's failure to furnish constant power, as agreed, testimony showing the profit of the mine when operatives were not interfered with, and the time during which there was a suspension of operations due to absence of current, is sufficiently definite to support a recovery.

Appeal from Sebastian Circuit Court, Fort Smith District; *Paul Little,* Judge; affirmed.

*Hill, Fitzhugh & Brizzolara,* for appellant.

1. The contract was in general terms, there being no agreement for the supply of any definite amount of current nor any guaranty that there would be no inter-

.ruptions, nor promise to take any definite amount, nor any special object for which current was taken. The contract was in general terms for the sale of current of electricity without any special provisions whatever. The proof shows defendant exercised the highest degree of care at all times. Any interruptions of service were solely on account of matters entirely beyond the control of defendant and in spite of all efforts to furnish current; no negligence was shown but the interruptions were caused by failure in the insulators, which it was impossible to obtain on account of the war and a strike. 112 Ark. 425 is different from this case, nor does 64 N. J. Law 240 apply. Wigmore on Publ. Serv. Corp., § § 657-9; 38 Mass. 417; 13 C. J. 640; 149 U. S. 1. See also 3 Page on Contracts, pp. 2113-2140.

2. Loss of anticipated profits were not recoverable. 91 Ark. 192; 49 C. C. A. 244; 91 Ark. 180; 1 Sedgwick on Dam., § § 184-6-7-8; 34 Ark. 184; 44 Penn. St. 156, 169; 91 Ark. 433; 113 *Id.* 588; 75 *Id.* 469; 77 *Id.* 150. The leading case in this State is 72 Ark. 275. See also 104 *Id.* 215; 139 U. S. 199; 1 Sedg. on Dam. (8 Ed.), § 159; 190 U. S. 540; 31 Okla. 292.

3. The instructions were erroneous, and the case tried entirely upon an erroneous theory as to the liability of appellant and the measure of damages. Cases *supra.*

4. If plaintiff was entitled to recover, the measure of damages was not the loss of profits but the rental value of the property or interest on the investment during the time of the interruptions of the business. 35 Atl. 1127; 3 Suth. on Dam., p. 2127; 77 Ark. 150; 134 *Id.* 345.

5. The evidence as to losses is not sufficient to support the judgment on the cross-appeal. See 77 Ark. 150.

*Warner, Hardin & Warner,* for appellee.

1. Defendant is liable for the breach of the contract. There was no ambiguity, and its construction was for the court and not the jury. 126 Ark. 19. The con-

tract was prepared by defendant alone and all doubts re-
solved against it.   112 *Id.* 6.

2.   Even if the contract was impossible of perform-
ance, defendant had agreed in absolute terms to perform
it and after breach non-performance from impossibility
was no defense.   112 Ark. 425; 52 L. R. A. (N. S.) 502;
126 Ark. 46, 50; 93 *Id.* 447-952; 234 Fed. 817; 105 Ark.
419; 91 *Id.* 180; 61 *Id.* 312; 181 S. W. 640; 13 C. J. 635-
706; note to L. R. A. 1916 F, 31-37 *et seq.;* 107 Me. 279; 78
Atl. 288; 91 N. Y. Supp. 544; 74 Pac. 52; 60 U. S. (L.
Ed.), 576; 34 So. 744; 183 S. W. 431; 164 Fed. 980.

112 Ark. 425-435 definitely settles the liability of de-
fendant for all damages caused by the breach.   See also
72 Fed. 227; L. R. A. 1916 F, 37 and note; 78 Atl. 288;
136 Ark. 231; 13 C. J. 637.

3.   The question of ordinary care does not enter
into this case.   The action is *ex contractu,* not *ex delicto.*
105 Ark. 419; 52 S. E. 677.

The defense of act of God was a conclusion and not
a statement of fact, and since the order to suspend was
of a temporary nature, it was available as a defense.
L. R. A. 1916 F, 67, also *Ib.* 12 and note 8.

The court below properly declared the effect of a vio-
lation of the contract.   45 Atl. 692; 112 Ark. 425; 89 *Id.*
24; 64 Ind. 125; 22 Atl. 633.

4.   Plaintiff was entitled to recover for loss of
profits and the instructions properly submitted the ques-
tion to a jury.   *U. S. Auto Co.* v. *Arkadelphia Mill Co.,*
ms. op., October 6, 1919; 136 Ark. 231; 111 *Id.* 474; 91
*Id.* 192.

Profits were reasonable in the contemplation of the
parties at the time the contract was made.   53 Ark. 434-
443; 69 *Id.* 219; 104 *Id.* 215; 74 *Id.* 358; 72 *Id.* 275; 71
Atl. 759; 4 R. C. L. 461, § 28; 6 L. R. A. (N. S.) 1058;
136 Ark. 231.

Defendant actually possessed sufficient knowledge
and notice of the special circumstances which might
cause special damages to follow the breach of contract.
8 R. C. L. 461, § 28.

5. The damages from loss of profits were *certain* in their nature and as respect to cause. Cases *supra;* 91 Ark. 433; 105 *Id.* 433; 63 Tex. 381; 38 So. 64; 17 C. J. 756, § 90; 111 Ark. 190.

6. There was no error in the instructions. The facts are undisputed and a directed verdict was proper. 104 Ark. 267; 57 *Id.* 461.

7. Plaintiff was entitled to recover damages for expenses incurred. 28 U. S. (L. Ed.), 168; 17 C. J. 798, note 18; 85 Ark. 605; 134 *Id.* 345. See also 134 Ark. 430; 1 Suth. on Dam., pp. 257-8; 17 C. J. 800, § 126 (b).

SMITH, J. The parties to this litigation entered into the following contract:

"The following contract entered into and made this 24th day of May, 1917, by and between the Katy Coal Company, a corporation duly organized and existing under and by virtue of the laws of the State of Arkansas, to be hereinafter referred to as the consumer, and the Coal District Power Company, a corporation duly organized and existing under and by virtue of the laws of the State of Arkansas, to be hereinafter referred to as the company. Witnesseth:

"For the sum of one dollar and other good and valuable considerations, each paid to the other, receipt of which is hereby acknowledged; the company agrees to deliver to the premises of the consumer at a central transformer station located at what is known as 'Midland Six Mine,' about one and one-half miles north of Midland, Arkansas, and the consumer agrees to accept, use and pay for upon the terms and conditions as herein provided, what is commercially styled Three Phase Sixty Cycle Alternating Current at a potential of approximately two hundred and twenty volts.

"The company agrees to build at its expense and provide sufficient transformer capacity, a transmission line to the location of a transformer station, said location to be decided upon by both parties to this contract. The consumer agrees to construct at its expense all pole lines,

wires, etc., etc., necessary for the conduction, or transmission of such electrical energy as it may use, from the transformer station to the location of the pumps, fans, hoists, or other power using appliances.

"The consumer agrees to and does hereby grant to the company permission to construct upon the land now owned or leased by the consumer, the transmission line necessary to serve the consumer, and to allow said company to extend said transmission line for the service of other consumers.

"The consumer agrees to pay the company all bills for electric power not later than the tenth of each month upon the following basis:

"First—A demand charge of one dollar per month per killowatt of maximum demand as indicated by the name plate ratings on the transformers installed, plus an energy charge of:

"First 1,000 K. W. H. per month.....................$0.04   k. w. h.
"Next 2,000 K. W. H. per month...................... .03   k. w. h.
"Next 3,000 K. W. H. per month...................... .025  k. w. h.
"Next 4,000 K. W. H. per month...................... .0225 k. w. h.
"All in excess of 10,000 K. W. H. per
    month ......+............................................................ .02   k. w.h.

"The consumer agrees that at no time during the life of this contract that a demand charge of less than forty killowatts shall be used.

"The company agrees to provide such additional capacity as the consumer may require for its purpose, however such additions in capacity shall establish the basis of the demand charge for the remainder of the life of this contract.

"This contract shall be in full force and effective force for a period of five (5) years from and after the date power is turned on the line, which shall not be later than sixty days from the date of the signing and acceptance of this contract, unless the company shall be prevented in the construction of said line by causes reasonably beyond its control."

The circumstances under which the contract was executed are as follows:    G. W. Skow was the superintendent of the power company, which is in the business of dealing commercially in electric power in the coal mining district, and he appears to have been conversant with the methods of mining coal generally and to have been familiar with conditions in appellee's mine.    The negotiations leading up to the contract were had between Skow and H. F. Rogers, the president and manager of the coal company.    The mine passed into the control of the coal company on April 15, 1917—it having been operated prior to that time under a different management—and was being operated at the time of the execution of the contract.    Skow and Rogers consulted, both at the company office and at the mine, and a blue print was prepared showing the details of the mine.    The blue print gave the dimensions of the slope and showed the number, position and dimensions of the entries connected with it and of a concrete dam which had been constructed to prevent the flow of water down a depression or swag in the mine from an adjacent creek.

Water accumulated at this depression and required pumping to prevent it flooding the mine.    A steam pump had been employed for this purpose with unsatisfactory results, owing to the distance from the steam power, and Skow was advised that steam power was being used for that purpose, and that electric power was desired for the purpose of operating the pump and supplanting steam as the power to be used in the general operation of the mine. Skow prepared the specifications for the pump and the accessories necessary to handle the water situation, and he advised Rogers the machinery necessary to install to use the electric current.    After these details had been discussion and agreed upon, Skow prepared the contract set out above, and it was executed without any change being **made.**

The coal company at its own expense erected the necessary poles and strung the wires for the transmission of the current and made all other essential preparations to

operate its plant with the current contracted for, at a very considerable expense to itself. No attempt was made to show any failure to perform on the part of the coal company nor that performance was prevented by an act of God or the public enemy, the defense made and relied upon being that performance was prevented by circumstances and conditions not under appellant's control and the details of which will be more fully stated.

The parties proceeded to operate under the contract and the coal company operated the mine with the current furnished by the power company and the current was sufficient for the coal company's purpose, except that frequent interruptions in the transmission of the current occurred. These interruptions varied in duration, and during their continuance the operation of portions of the mine was interfered with, as a result of which it is said the damages sued for were sustained.

The power company admits it did not furnish the service called for by the contract, but contends that it used the utmost diligence in the effort to do so and seeks to exonerate itself from liability for the damages sustained on that account.

The interruption in the service commenced about November 22, 1917, and continued until February 13, 1918. The trouble appears to have been caused by the breaking down of a number of insulators, and the testimony showed that it was impracticable, if not impossible, to get the style of insulators then in use on the lines connecting with the power company's plant for the reason that some of the ingredients in the compound used in the old style of insulators were made in Germany, and on account of the World War could not be secured. After discovering the cause of the trouble the power company made diligent effort to procure a different kind of insulator and did procure them as soon as it was able to do so.

Under the facts stated the court construed the contract as imposing an absolute duty on the power company to furnish current, and in one of the instructions given told the jury the power company was liable for the dam-

age resulting from its breach of the contract if default had been made in failing to furnish current, and only this question and the question of damages were submitted to the jury. The damages claimed were loss of profits upon the production of coal and money paid out for excessive labor and power in the operation of the mine without the electric current. The instructions given submitted the question of loss of profits on the production of coal, but refused to submit the question of increased cost of operation as a separate ground of recovery. There was a judgment for the coal company for $3,500, and both sides have appealed.

We think the court correctly interpreted the contract set out above. A demand charge of one dollar per month per kilowatt was provided for and also that "the consumer agrees that at no time during the life of this contract that a demand charge of less than forty kilowatts shall be used," so that a minimum consumption of current amounting to $40 per month was provided for. It was also provided that "the company agrees to provide such additional capacity as the consumer may require for its purpose, however such additions in capacity shall establish the basis of the demand charge for the remainder of the life of the contract."

Anticipating that the current contracted for would be furnished, the coal company removed the concrete dam and proceeded to operate the mine. The removal of this dam increased the necessity for this current to operate the pumps to prevent the flooding of the mine.

This case is not distinguishable in principle from the case of *Harrington* v. *Blohm,* 136 Ark. 231. There Harrington had contracted to equip a pumping plant ready for operation by June 1, and through his failure to do so there was an insufficient supply of water to cultivate and mature Blohm's rice crop. Harrington sought to excuse this failure and the consequent liability for damages by showing that he had "used his best endeavors to get said well and machinery installed before June 1 and that the

failure to do so was no fault of defendant's (Harrington)."

We said however that Harrington could not be excused by that showing, that the obligations of the contract were reciprocal, and that it must have been in the contemplation of the parties that damage to the rice crop would result if water were not furnished. So here it must have been in the contemplation of the parties that damage would result if the required electric current was not furnished, and this current was as essential here as was water in the case of *Harrington* v. *Blohm, supra.*

The circumstances of the case show that the parties to the contract must have contemplated the uses to which the current would be put and the consequences of the failure to furnish it, and that the coal company would begin the operation of the mines in reliance upon the performance of the contract. Measured by this test, we think it must be said here, as was said in the case of *Midland Valley Rd. Co.* v. *Hoffman Coal Co.,* 91 Ark. 194, that "the net profits of operating the mine as damages for a breach of the contract may fairly be said to have been in contemplation of the parties when the contract for furnishing cars (electric current) for the shipment (mining) of appellee's coal was entered into."

There is a cross-appeal here upon which we are asked to render judgment for the excessive cost of operation due to the failure to furnish the current. This we can not do, as that issue was not separately submitted to the jury, and a reversal of the judgment wuld be required if it appeared that error had been committed in this respect. We think error was not committed in that respect, as a consideration of all operating costs should have been taken into account in ascertaining profits.

One of the chief reasons urged for the reversal of the judgment is that the testimony is not sufficiently definite and certain to support the recovery. But the testimony did show the output of the mine when operations were not interfered with and that under those circumstances a profit of fifty cents per ton was made, and a

record was kept of the time during which there was a suspension of operation due to the absence of the current, so that we conclude the damages assessed were not speculative or conjectural.

We do not set out or discuss the instructions, as no specific objection is pointed out to any particular instruction, the insistence being that the court should have submitted to the jury the sufficiency of appellant's excuse for nonperformance, and that the testimony was not sufficiently definite to support a recovery of profits.

We do not agree with appellant upon either contention, and no other error appearing the judgment is affirmed.