OTTO HENNEKE, RESPONDENT, v. GASCONADE POWER COMPANY, APPELLANT.—152 S. W. (2d) 667.

Kansas City Court of Appeals. May 26, 1941.

R. W. Hedrick, Frank E. Atwood and L. G. Graf for appellant.

102

*Joseph T. Tate, James Booth* and *James L. Anding* for respondent.

CAVE, J.—Plaintiff brought this action in two counts to recover damages on account of the loss of a certain number of fertile turkey eggs which were in the process of hatching. The plaintiff alleged the loss was due to the negligence of the defendant in failing to supply the plaintiff with constant and continuous current, which will be more fully discussed. Upon a trial the verdict of the jury was for the plaintiff on both counts. The defendant has appealed.

The case was tried and submitted to the jury by the plaintiff on the theory that the *res ipsa loquitur* doctrine applied, and the defendant joined in this theory, but denies that the evidence brings the case within such doctrine.

The petition was in two counts, declaring on general negligence, and defendant's answer, to both counts, was a general denial.

The evidence shows that the defendant used and supplied electric power which was generated in Jefferson City, Missouri, and transmitted from there over a 33,000 volt line to Linn, Missouri. There the main line was divided into two branches referred to as the north and south branches and each carried 33,000 volts. The south branch is the one here involved; it supplied electric current to the community of Belle, Bland, Owensville and Gerald. A short distance east of Bland there was a transformer substation, the function of which was to "boost" the power eastward through Owensville and other communities. That at Owensville the power was taken off the "highline" (33,000 volts) and reduced to 2300 volts for consumption by its customers through the Owensville local electric system. There was also at Owensville a "stand-by" plant owned by the defendant, but formerly owned and operated for about 20 years by Simon Helling, but at the time of this occurrence such plant was used only on occasions of interruptions of current on the high-line.

The evidence disclosed that the local distributing system of Owensville was equipped with some 30 transformers, serving about 450 customers.

Plaintiff described in detail the process of hatching turkey eggs with the plant and equipment he had. That the process takes about 28 days, and that during about the last three days there must be constant and continuous heat and that if that should be interrupted for ten minutes or more, at any one time, the eggs will become chilled and the "poults" would die.

Plaintiff further testified that he owned a farm about one-half mile from Owensville on which he operated a turkey hatchery and developed poult turkeys for commercial use, and had been doing so for about 11 years. That he raised about 10,000 poults a year. That prior to March, 1937, he owned and operated a hot water system hatchery and used either oil or coal for heat. In January, 1937, the plaintiff discussed with Norman Paxton, defendant's local manager, the possibility of disposing of the hatchery he then had and installing a new one which would be heated and operated by electricity. "And I told him, in order to have current down on the farm, I had to have continuous and constant current, uninterrupted current all the way through, otherwise I would not be interested in the power. I explained the equipment to him." Mr. Paxton and Mr. Farris, another employee of the defendant, came to his farm and he showed them the place where the equipment was to be put and he again told them that he "must have constant and continuous heat there." That conversation was in February, 1937.

The trial court admitted in evidence the statements made by the plaintiff to defendant's agents for the sole purpose of showing notice

of the purposes for which the current was to be used. The court did not permit the plaintiff to relate any statement made to him by the agents of the defendant.

About March 10, 1937, the plaintiff signed a written contract with the defendant for electrical service. This contract was admitted to prove he was a customer of defendant and it is not necessary to set it out in full, but such parts as may be pertinent will be discussed.

After signing the written contract plaintiff purchased some new equipment which consisted of ''two No. 9 incubating units and one separate 24 hour hatcher.'' After this equipment was installed in the basement Mr. Paxton and Mr. Farris came and connected the electric current with the incubator and hatcher and put in a transformer and meter. This was done about March 16, 1937. The plaintiff said he had nothing to do with attaching the electric parts to the equipment and that he had no control over any of the electric equipment and did not exercise any such control. After the electric power was connected with the hatching unit he had no other method of heating the equipment for the purpose of hatching eggs. That on April 15, 1937, he was in the basement attending to the hatch which was taking place on that day, and that about four P. M. the electric power ''went off'' and remained off for about four hours; that as a result of the power going off the poults in the incubators were greatly damaged and that he lost 1232 baby turkeys which were of the reasonable value of $554.40. He said he did not know why the current ''went off,'' but that within five minutes thereafter his wife telephoned Mr. Sanders, defendant's manager at Hermann, Missouri, and told him the current was off and that he said he would see what could be done about it. It was clear and there was no thunder or lightning. The plaintiff went to the emergency plant in Owensville but found no one there and there was no effort made by the defendant to start the ''stand-by'' or emergency plant.

Relating to the second count of his petition the plaintiff testified that on July 9, 1938, about 8 P. M., the electric power ''went off'' again and remained off from three to three and one-half hours and that as a result thereof he lost 2250 poults which were of the reasonable value of $810.60. Immediately after the power went off he telephoned Mr. Burt, the defendant's engineer at Hermann and told him about it and he said he would see what he could do. The power did not come on until 11:30 P. M. It was a clear night and he did not know why the power went off.

On cross-examination the plaintiff said he reported his loss of April 15, 1937, to Mr. Paxton on the next day but did not demand any specific sum at that time. Turkey eggs cannot stand more than ten minutes interruption in heat service without a loss, and if the current is off 3 or 4 hours the eggs are worthless because the poult dies in the

egg shell. He threw the eggs away after each of those times the current went off.

Witness Adolph Knehans testified that he operated the Roller Mills at Owensville and was a customer of the defendant power company in 1937 and 1938. He did not recall the power going off on April 15, 1937, but did recall it going off on July 9, 1938. The power went off about 8 P. M. and was off at his home and in the business district of Owensville. He did not know when the power came on again because he went to bed at 10 o'clock. The night was clear.

Witness D. W. Williams testified that he is a doctor in Owensville and ran the theatre there at that time and was a customer of the defendant company. He recalled the power going off on the night of July 9, 1938, and that his picture show waited until 11 o'clock. The power did not come on and they closed the show.

William Wanura testified that he owned a bakery in Owensville and recalled that the power went off in July, 1938, at about 8 o'clock in the evening and had not come on again at 11 o'clock. It was a clear night. He had no recollection of the power going off in 1937.

Simon Helling testified that he lived in Owensville 34 years and that he had, at one time, owned and operated the old electric plant, which is referred to as the "stand-by" plant. He remembered the current going off on April 15, 1937. That is occurred about 4 P. M. and lasted for 3 or 4 hours. He also remembered the current going off on July 9, and that it occurred about 8 o'clock p. m. and had not come on again at 11 P. M. The "stand-by" plant could have been operated on either of those occasions. On cross-examination he further testified that he had operated the local plant, which is referred to as the "stand-by" plant, for 20 years and that during that time he had had the current "go off," and that it was impossible to discover before hand what caused it.

Oscar Wehmeyer testified that he operated a filling station and restaurant one-half mile west of Rosebud and that he remembered the current went off at his cabins and restaurant on April 15, 1937, and was off from about 4 P. M. until 8 P. M. He did not know whether the current was off at Owensville or plaintiff's farm but that the power line which served his place passes through Owensville and on down to Rosebud.

At the close of plaintiff's evidence the defendant offered a demurrer which was overruled.

Defendant's evidence:

Norman Paxton testified as follows:

"I am the local superintendent of the Gasconade Power Company at Owensville. It is my duty to take care of the equipment, to read meters and watch general operations. I know all interruption of electric service. There was no cessation of service on April 15, 1937 to my knowledge. If there had been I would have known it. There

was an interruption on April 13, 1937. . . . Mr. Robinson, an employee of the company, informed us that there apparently was some trouble on the line causing severe telephone noise and radio interference. When we got to Owensville the current was still on and no interruption had occurred up to that time. That was the latter part of the afternoon. We patrolled the line in Owensville and the lines extending from Owensville toward Bland and failing to find anything that was causing this trouble, we returned to Owensville. On the second patrol we had reached Bland and happened to know that Mr. Whitted and Mr. Nichols, also employees of the company, were at Bland and got them to assist us. When we got to the hotel there to meet them the current 'went off.' That was about 5:15 P. M. We called Hermann to try to locate the cause. Whitted and Nichols remained in Bland and Robinson and I drove back to Owensville and started the 'stand-by' plant at about 6:30. . . . After that we serviced Mr. Henneke's hatchery and continued to service it until the high-line came on. There was no other interruption of service to Henneke's that I know of. All of this happened on April 13, 1937. Mr. Henneke's hatchery is serviced through the Owensville distributing system. His line is not hooked up directly with the high-line.

"On July 9, 1938, an interruption occurred that would have affected Mr. Henneke. It was at 8:30 in the evening. Mr. Farris and I were in the theatre at the time. We left immediately and proceeded to the stand-by plant. When we got there we found an automatic switch in the plant itself had opened permitting this section of town to be without current. We made several attempts to close the switch but were unable to do so, due to a faulty condition out on the line, in the distribution system. We then left the plant and proceeded out on the distributing system trying to locate what was causing this trouble. About 9:30 we called Mr. Burt, chief engineer of the company at Hermann, to request his assistance. We wanted to get the service back on as quickly as possible. We were told that he had left Hermann and was on his way to Owensville. We continued eliminating various parts of the line to isolate the trouble and Mr. Burt arrived about 10:30 or quarter to eleven."

The witness then detailed the methods used to locate the cause of current being in Owensville. They soon found that the current was coming over the line into Owensville but was not going over one of the lines which served the business district and the southern residential section of Owensville, and which also serviced plaintiff's farm. Under such conditions the starting of the stand-by plant would not have done any good. After considerable investigation they found the trouble was due to "a short circuited transformer." The transformer had a fault within itself that wouldn't permit the current to enter it. "In other words, it was in a bad condition." That transformer was located in the business district of Owensville and was

removed and proper connections and proper service restored about 11 P. M., July 9th. That such transformer was on the line which gave service to the plaintiff. He did not examine the transformer himself to determine the fault but there was no external evidence of a defective condition. He further testified that interruptions of electrical service are not unusual occurrences; and that there is no way of foretelling when or how an interruption will occur. He had no recollection of the plaintiff making any demand of him or any complaint to him about an interruption of service in April, 1937, but that he did recall the plaintiff telling him the next day after the July 9, 1938, interruption that he had suffered some damages as a result thereof.

On cross-examination this witness again related methods used to locate the cause of interruption of service and what was done to correct it.

Archie Burt testified that he was an engineer for defendant during the years of 1937 and 1938 and was residing in Hermann, Missouri; that it was his duty to take care of construction, operation, etc., of all of defendant's lines. He recalled the interruption of service on April 13, 1937, because the service was also interrupted at Hermann, Missouri. When the service went off he immediately called the "main switching center" at Linn. He did what was necessary to restore electric service to Hermann, and then immediately went to Owensville, arriving about 6:30 P. M., where he found his employees operating the "stand-by" plant at Owensville. He then went to the defendant's substation just east of Bland, where he met three of defendant's employees. They found that the current was coming into the town of Bland but was not passing over their main line to the east of that point, and they immediately examined the substation transformers. There was no external evidence showing anything wrong with the transformers, but by making certain tests they found that there was some trouble within the transformers. There were a number of transformers within this substation and each one was disconnected until they found the one causing the trouble. Upon taking it apart they found that a "bushing" was cracked and broken down. The bushing is a porcelain that leads the wires into the transformer; it is located inside of the covering of the transformer and any breakage cannot be seen or observed from the outside. The breaking down of this bushing "caused the current to become shorted and it couldn't go through the transformer." This would stop the service of electricity eastward from this substation.

A number of other witnesses for the defendant testified to substantially the same set of facts, but it is unnecessary to detail their testimony.

The evidence was sharply conflicting in many particulars and the jury's verdict is binding on us in such matters.

Defendant filed a motion to make the petition more definite and certain in the following particulars:

(1) "By stating whether the alleged contract was oral or in writing. (2) By stating the time and place of the alleged contract. (3) By filing a copy of the alleged contract if in writing and not signed by defendant." This motion was overruled, but the defendant does not now make any point of such ruling. It filed a general denial for answer to each count.

The case was tried by both parties on the theory that the petition declared on general negligence and was submitted to the jury on the *res ipsa loquitur* doctrine.

Defendant's first complaint is that the court erred in refusing its instruction in the nature of a demurrer offered at the close of plaintiff's evidence and again at the close of the whole case; because (a) "the pleadings and proof did not bring the case within the *res ipsa loquitur* rule"; and (b) "the evidence as a whole fails to show negligence on part of defendant."

The defendant argues that the *burden* of *proving negligence* on the part of defendant, which was the proximate cause of damage, was on plaintiff and that such *burden* never shifts to defendant, even in a *res ipsa loquitur* case. There is no doubt about that being the rule in Missouri. In the recent case of Evans v. Missouri Pac. R. Co., 116 S. W. (2d) 8, our Supreme Court stated the rule as follows: "Our court has held that the *burden of proof* never shifts and that the presumption raised by the doctrine of *res ipsa loquitur*, relating at it does to the burden of proof, remains in the case to the end and *will take the case to the jury, notwithstanding the evidence, however probative, given in rebuttal on behalf of defendant.*" (Italics ours.) Many Missouri cases supporting that doctrine are cited in the opinion. But as we read this record, the question of the *"shifting of burden of proof"* is not in issue, by instruction or otherwise.

The serious question, and the one most vigorously pressed by defendant, is, does the evidence make a submissible case under the *res ipsa loquitur* doctrine? If so, then it makes no difference how strong defendant's evidence of exculpation is, the case must be submitted to the jury. [Evans v. Mo. Pac. R. Co., *supra*; Walters v. Adams Transfer and Storage Co., 141 S. W. (2d) 205.]

The courts have required certain basic and fundamental facts to be proven before a *res ipsa* case is made out.

In the Evans case, *supra*, the Supreme Court defined the basic requirements thus:

" 'Where the instrumentality which causes an injury is within the control of, and operated by, a party, and moves or operates in such a way that such motion or operation would not have happened except for some defect or negligent act, and injury to some person results, then the doctrine of *res ipsa loquitur* applies, and a plaintiff suing for an injury so caused has only to show *control of the instrumentality by the defendant and its usual movements*. It is then for

the defendant to explain if it can the casualty so 'as to exclude negligence on its part. [Ash v. Woodward Printing Co. (Mo.), 199 S. W. 994, l. c. 997; Blanton v. Dold, 109 Mo. (64), l. c. 75, 18 S. W. 1149; Thompson v. Railroad, 243 Mo. 336, l. c. 354, 148 S. W. 484; Gibler v. Railroad, 148 Mo. App. 475, l. c. 484, 128 S. W. 791; Mayne v. Kansas City Railways Co., 287 Mo. 235, l. c. 248, 229 S. W. 386, 390.]' "

In Walters v. Adams Transfer and Storage Co., *supra*, this court said:

"We conclude the case at bar is one for the application of the *res ipsa loquitur* doctrine. This doctrine 'does not apply except when (a) *the occurrence resulting in injury was such as does not ordinarily happen if those in charge use due care*; (b) *the instrumentalities involved were under the management and control of the defendant*; (c) *and the defendant possesses superior knowledge or means of information as to the cause of the occurrence.*' [McCloskey v. Koplar, 329 Mo. 527, 46 S. W. (2d) 557, 559, 92 A. L. R. 641.]"

Many other Missouri cases could be referred to announcing substantially the same requirements but the two cases quoted have gathered the authorities of this and other jurisdictions and we will not burden this opinion by again citing or quoting them.

In the case at bar it must be conceded by the defendant, and from its brief we think it is conceded, that two of the above requirements are certainly met and are applicable in this case. Those two requirements are: (b) The instrumentalities involved were under the management and control of the defendant; (c) the defendant possesses superior knowledge or means of information as to the cause of the interruption of the current. However, the defendant does argue strenuously and ably that the interruption of electrical current is not a condition "such as does not ordinarily happen if those in charge use due care." On the contrary, it asserts that the evidence shows that the interruption of current is not an "unusual" or "out of the ordinary" happening. It is true that plaintiff's witness, Simon Helling, testified on cross-examination that he had owned and operated the local electric plant at Owensville for 20 years; and that during that time his plant had had "outages" or interruptions in electric current and that it was impossible to discover beforehand what might cause the interruption. However, this witness does not state any facts concerning the length of time of such interruptions of his service nor the cause or frequency thereof. It is perfectly possible that a mere fleeting interruption of service would not justify an inference or presumption of negligence on the part of the electric company; but in this case plaintiff's evidence was that on the first occurrence there was an interruption or "outage" of about four hours, and on the second occurrence the interruption or "outage" was from three and one-half to four hours. We believe, and so rule, that such an extended period of in-

terruption of service, together with other facts in evidence, is sufficient to entitle the court and jury to "infer" and indulge in "the presumption" that there was a breakdown in some of the instrumentalities used by the defendant in supplying electric current to its customers, and that such breakdown or deterioration was due to the negligence of the defendant. In other words, an interruption of electric current for some three and one-half hours was an occurrence "such as does not ordinarily happen if those in charge use due care."

We have read the cases cited by the defendant and find that none of them rule the direct point involved here, that is, damages resulting from "interrupted service;" but we do believe all of the cases relied on by the defendant may be said to use the three fundamental guide posts, set out in the opinion in the Walters case, *supra,* in deciding whether the particular case under consideration falls within the *res ipsa loquitur* doctrine.

Defendant also relies on its explanation that the cause of the interruption of service was the breakdown of one of its transformers which could not be known or anticipated in advance of the breakdown; but, under the authorities above cited, this does not destroy the *prima facie* case made by plaintiff. That question must be submitted to the jury, which was done in this case.

The Supreme Court of Rhode Island in the case of Reynolds v. Electric Light Company, 59 Atl. 393, made this very pointed and pertinent observation in a case where a transformer failed to do the things for which it was intended; the court said:

"The accident occurred through a burning out, breaking down, or other weakened condition of the transformer, which incapacitated it from doing its work, with the result that, instead of the intended current of 104 volts, the alternating current of 2,000 volts was received into the lighting system of the building, and, through that, into the body of the deceased, as he stood grounded upon the cellar bottom. The transformer was an apparatus wholly under the control of the defendant, and its breaking down, or functional derangement, *is inferentially evidence of negligence on the part of the defendant, thus making out a prima facie case for the plaintiff, and casts upon the defendant the burden of rebutting the same to the satisfaction of the jury."* (Italics ours.)

In the case of Glasco Electric Co. v. Union Electric Light & Power Co., 61 S. W. (2d) 955, l. c. 957, our Supreme Court announces the same doctrine in the following language:

"The *res ipsa loquitur* doctrine finds frequent application in cases against electric companies, and, when in such case the petition charges general negligence only and the facts and circumstances in plaintiff's evidence show that, without fault on the part of plaintiff, the injury or damage complained of was caused by the escape of electricity from wires and appliances under the exclusive control and manage-

ment of such company and the occurrence is such as does not ordinarily happen if those having such control and management use proper care, a presumption or inference of negligence, or want of proper care, on the part of defendant electric company, arises, and *the weight of the inference as well as the weight of such explanation, if any, the defendant makes, is for the jury.* When, under the circumstances of the particular case, the doctrine of *res ipsa loquitur* is applicable, it constitutes an exception or qualification of the general rule that negligence is not to be presumed, but must be affirmatively proven, and operates as a substitute for specific proof of negligence or proof of specific negligence so as to make a *prima facie* case, which, if unexplained, carries the question of negligence to the jury and is sufficient to warrant and sustain a finding of negligence on the part of defendant." (Italics ours.)

Numerous other citations could be given which announce substantially the same doctrine, but we see no occasion to further encumber this opinion with such additional citations.

The evidence in this case shows that the defendant had knowledge of the kind and character of business in which the plaintiff was engaged, and while the defendant was not an insurer of constant electric service, nevertheless it being a public utility engaged in the supplying of electricity to its customers, it was its duty to use due care to supply the plaintiff and its other customers with such current; and we believe, and so rule that, the evidence in this case brings it within the *res ipsa loquitur* doctrine, and that the court properly overruled the demurrers offered by the defendant.

By Instruction No. 3 the court submitted the case to the jury under the *res ipsa loquitur* doctrine and the only objection defendant raises to that instruction is that the evidence in the case does not bring it within that doctrine and, therefore, such an instruction should not have been given. Having ruled that this case is within the *res ipsa loquitur* doctrine, disposes of defendant's criticism of Instruction 3.

Defendant next complains that the court erred in admitting testimony of oral conversations and negotiations between plaintiff and defendant prior to the execution of the written contract for the furnishing of electric current to the plaintiff, and urges that familiar and well settled principle of law that "where preliminary negotations are consummated by a written agreement, the writing supersedes all previous understandings, and the intent of the parties must be ascertained therefrom." But as we read this record that principle of law does not apply to the situation here presented. This is not a suit upon a contract, written or oral, it is a suit founded in tort. The trial court was very careful in preventing the plaintiff from testifying to anything defendant's agents said to him and restricted the evidence to a recitation of what the plaintiff said to them concern-

ing the kind of business he operated and the need for constant electric service. Such evidence was admitted for the sole purpose of proving notice to the defendant, and not for the purpose of proving a contract, or changing the terms of a later written agreement.

Furthermore, at the request of defendant, the court gave an instruction telling the jury in substance that all oral representations, negotiations, and agreements of every kind between plaintiff and defendant were merged in the written contract, and that nothing said or done prior to said written contract should be deemed binding as to contractual relations. We believe this instruction would make it perfectly clear to the jury that the oral conversations which took place in January and March did not constitute any contract between the parties or place any contractual burden on the defendant. We have examined the cases cited by defendant and while they announce the general principle of law urged, the facts and issues in those cases will clearly distinguish them from the situation in issue here. We rule this point against defendant.

The last complaint made by defendant is to the introduction of plaintiff's exhibits "D" and "E." These were blocks of wood, cut from a tree or trees, and showed a wire embedded in the wood some two or three inches. The evident purpose was to prove the defendant had not properly maintained its lines. However, the printed record is so imperfect in presenting just what occurred concerning these two exhibits, that the plaintiff in his brief, quotes evidence from the original bill of exceptions which, he contends, was not included in the printed abstract, and the defendant in its reply brief asserts the quotation is not accurate and proceeds to quote that bit of evidence, together with other evidence, in the bill of exceptions but not included in the printed abstract. Considering the unsatisfactory state of the record concerning these two exhibits, we do not feel justified in passing on the point as presented. We should not convict the trial court of error under such circumstances.

Finding no error in the record, the judgment should be affirmed. It is so ordered. All concur.