**NATIONAL FOOD STORES, INC.**, a corporation, Plaintiff-Appellant,

v.

**UNION ELECTRIC COMPANY**, a corporation, Defendant-Respondent.

No. 34375.

Missouri Court of Appeals,
St. Louis District,
Division Two.

April 17, 1973.

Shifrin, Treiman, Schermer & Gallop, Israel Treiman, Richard H. Ulrich, St. Louis, for plaintiff-appellant.

Keefe, Schlafly, Griesedieck & Ferrell, William H. Ferrell, Francis L. Barkofske, Stewart W. Smith, Jr., St. Louis, for defendant-respondent.

McMILLAN, Judge.

This is an appeal by plaintiff, National Food Stores, Inc., (hereinafter referred to as National) from a judgment of the Circuit Court of the City of St. Louis which sustained defendant's, Union Electric Company (hereinafter referred to as Union Electric) motion to set aside a verdict and judgment for National and to enter judgment for Union Electric.

National sued Union Electric for damages that resulted from the spoilage of certain perishable food items kept in its stores, because of an interruption by Union Electric of its electrical service to National. A jury verdict for $5800.00 was found for National. Upon Union Electric's motion for judgment or in the alternative for a new trial, the court (1) set aside the verdict because there was no basis for legal liability; or (2) in the event on appeal a basis for liability was found, a new trial was ordered because of an erroneous verdict directing instruction.

Since there is no serious dispute over the facts and the controversy is legal, only a brief resume of the facts will be given. Other facts, if needed, will be referred to during the course of the opinion.

In June and July 1966 the City of St. Louis experienced a record breaking heat wave. The high temperatures put a great stress upon the capacity of Union Electric to meet the power needs of both its city and county consumers. During the morning of 11 July 1966, Union Electric was operating within 290 megawatts of its total capacity. In recognition of the gravity of the situation, Union Electric put into effect its five phase "Emergency Load Reduction of Power Curtailment" plan.

At 7:55 A.M., 11 July 1966, Union Electric (Phase I) disconnected service to its "interruptable customers." For these contract customers neither reasons nor notices were necessary. Phase Two, which was a 5% voltage reduction, was not used. At 10:00 A.M., the same morning, the power drain continued; therefore, Union Electric (Phase Three) began to contact its 200 largest industrial consumers, and on a voluntary basis requested that each of them reduce their power consumption. By 12:30 P.M., all had been contacted.

At 1:47 P.M., the same afternoon, Union Electric (skipping phase four, which provided for a general notice to the general public by the media) put into operation phase five, which called for the involuntary curtailment of service periodically to certain specified geographical areas throughout the entire St. Louis Metropolitan area. It was the phase five interruption, without notice to National, which National claims resulted in spoilage to its food stuff in various stores throughout the area.

Union Electric contends as follows (1) that it owed no duty to National to advise it of an interruption of electrical service to each of its stores before an interruption occurred; (2) that National's damages were not reasonably attributable to a failure to give notice; (3) that if damages are allowed they are limited in Union Electric's tariff on file with the Missouri Public Service Commission; and (4) that in the event there is found a basis of legal liability, a new trial is in order because of National's faulty verdict directing instruction.

■ First, we take up Union Electric's claim that it owed no duty to National to give it a warning of an interruption of service. Generally speaking, an electric power company which undertakes to supply current, although not an insurer of service, has an obligation to provide a patron with adequate and continuous service, arising either from express contract, a regulatory enactment, or implied contract and the supplier is, ordinarily at least, subject to a duty to exercise reasonable care to fulfill such obligation.[1] In Ellyson v. Missouri Power and Light Co., 59 S.W.2d 714 (Mo. App.1933), our court held that for an interruption of service by an electricity company a person may sue in tort as well as for breach of contract. In the Ellyson case the evidence disclosed that the defendant had contracted with plaintiff to maintain a continuous and sufficient supply of power at all times, and had additionally represented that it would furnish current from a secondary supply in the event of an emergency. The negligence charged was the failure to keep the secondary supply in good repair.

There are cases that hold when the action is based upon negligence, power suppliers are relieved from liability for unintended interruptions, either as a matter of general principle or because of an express contractual or regulatory provision, where the interruption resulted from an "Act of God" or from circumstances beyond the control of the supplier. See Monolith Portland Midwest Co. v. Western Public Service Co., 142 F.2d 857 (10th Cir. 1944);

1. 26 Am.Jur.2d, Electricity, § 112.

Florida Power Corp. v. Tallahassee, 154 Fla. 638, 18 So.2d 671 (Fla.1944); and Arkansas Power & Light Co. v. Abboud, 204 Ark. 808, 164 S.W.2d 1000 (Ark.1942), holding no liability would attach for an interruption caused by external forces outside of the control of the power company, which were not reasonably foreseeable. But see Coal Dist. Power Co. v. Katy Coal Co., 141 Ark. 337, 217 S.W. 449 (Ark. 1919), in which a lack of availability of certain materials as a result of the war effort did not relieve defendant from liability.

■ While the instant case is not a breakdown by an "Act of God" or from circumstances beyond the control of the supplier as outlined in the above cases, this case does involve the cessation of power by the supplier due to an emergency situation over which the supplier had no control. We concede that under the conditions existing on the morning of 11 July 1966 Union Electric was justified in its decision to cut off service in various portions of the area throughout the afternoon and evening of that day and into July 12. However, the fact of an emergency does not relieve Union Electric of its general duty to exercise reasonable care to avoid undue harm to its consumers where the harm is reasonably foreseeable. Union Electric says there was no duty to advise National of the interruption of power.

In Heaven v. Pender, 11 Q.B.D. 503 (1883), Brett, M.R., afterwards Lord Esher, made the first attempt to state a formula of duty as follows:

" . . . that whenever one person is by circumstances placed in such a position with regard to another, that every one of ordinary sense who did think would at once recognise that if he did not use ordinary care and skill in his own conduct with regard to those circumstances he would cause danger of in-

jury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger."

Subsequently, Lord Esher, himself, in Le Lievre v. Gould, 1 Q.B. 491 (1893), recognized that while the formula was overly broad yet it was still good where a defendant took some affirmative action. So, in our opinion, Union Electric was by virtue of its own charter placed in a position to its customers so that if it did not use ordinary care in the exercise of its franchise numerous injuries to both person and property could reasonably occur. Likewise, this general duty owed by a public utility to its customers is supplemented by the statutory obligation imposed on electrical corporations by § 393.130(1), RSMo 1969,[2] which provides as follows:

"Every . . . electrical corporation . . . shall furnish and provide such service instrumentalities and facilities as shall be safe and adequate and in all respects just and reasonable . . . "

In Langley v. Pacific Gas & Electric Co., 41 Cal.2d 655, 262 P.2d 849 (Cal.Banc 1953), an owner of a trout hatchery sued to recover damages as a result of the death of 78,000 trout. Plaintiff claimed that the electric power necessary to pump water into the hatchery had gone off for about five hours due to a failure of defendant's voltage regulator. As a result of the power interruption the fish did not get sufficient water and died. The evidence showed that plaintiff had advised the defendant of the necessity of a continuous flow of power, and that defendant had agreed to notify them of the outage. Granted, the Langley case was founded upon contract, however, Justice Traynor clearly sets forth the general standard of conduct required of a public utility when he states:

" . . . defendant agreed to furnish electricity in accordance with the appli-

2. All references to statutory enactment are to RSMo 1969, V.A.M.S., unless otherwise specified.

cable rules and regulations of the Public Utilities Commission . . . Defendant contends that under these provisions its duty is limited to exercising reasonable diligence to furnish a continuous and sufficient supply of electricity, and that it is under no duty to exercise reasonable care or diligence to prevent loss from power failure when it is not legally responsible for the power failure itself. These provisions deal with the duty to supply power, and they make clear that defendant is not an insurer or guarantor of service. *In no way, however, do they* [3] *abrogate defendant's general duty to exercise reasonable care in operating its system to avoid unreasonable risks of harm to . . . property of its customers.* (Emphasis added.)

"In the present case it is undisputed that defendant was not responsible for the power failure and that it exercised reasonable diligence to restore service. Accordingly, the question presented is whether . . . it could reasonably be concluded that its duty to exercise due care toward plaintiff in the operation of its system required it to give notice of the power failure when it knew that the failure to give notice would result in serious loss. In an analogous situation, a common carrier does not have a duty to transport goods immediately, but merely to use due diligence to deliver goods offered for shipment within a reasonable time . . . Nevertheless, . . . if the carrier is aware that causes of unusual delay exist of which the shipper is unaware, and does not inform the shipper of the facts, the carrier is liable for injuries caused by delay . . .

\* \* \* \* \* \*

" . . . By undertaking to supply electricity to plaintiff, defendant obligated itself to exercise reasonable care toward him, and failure to exercise such care has the characteristics of both a *breach of contract and a tort . . .* " (Emphasis added.)

This is in accordance with the principle in the Ellyson case, supra.

■ Public utilities occupy a unique position in our society. They furnish indispensable services while enjoying a privileged legal status. As consumers, our dependency upon their services is almost total. As such it is essential that such companies conduct themselves in a manner that does not take advantage of our dependency on them nor of the privileged status granted to them by the state legislature. While we do not propose that public utilities, in this instance an electrical company, are insurers or guarantors of the safety of persons or of their property, Henneke v. Gasconade Power Co., 236 Mo.App. 100, 152 S.W.2d 667 (1941); Hamilton v. Laclede Electric Co-op, 294 S.W.2d 11 (Mo.1956); and Donovan v. Union Electric Co., 454 S. W.2d 623 (Mo.App.1970), we hold there is as a matter of law a duty on Union Electric to protect its customers from foreseeable damage from failure of electrical service.

■ In this case, it is incumbent upon us to determine if Union Electric's conduct in failing to warn National of its planned interruptions of National's service breached Union Electric's duty to avoid unreasonable risks of damage to National's property. Although the general rule is that once a utility undertakes to supply electrical current they owe a duty to supply continuous service, we recognize that this duty is tempered by the utility's right to interrupt such service when an emergency situation necessitates the curtailment or total cessation of power.[4] Still, the right to

---

3. "They" in this instance are the provisions of Rule 14 of the applicable rules and regulations of the California Public Utility Commission. Rule 14 requires, among other things, that the utility must exercise "reasonable diligence and care to supply energy to the customer but does not guarantee continuity of sufficiency of supply."

4. 29 C.J.S. Electricity § 25b, pp. 986–987 (see cases cited in Note 96; 29 Am.Jur., Electricity, § 112, p. 221 (see cases cited in Note 8).

interrupt service in the face of an emergency is a far different thing from relieving a utility of liability where it fails to give a reasonable notice to its consumers of its intentions to interrupt services when the utility knows or could reasonably anticipate a situation that would make it necessary to interrupt service and the utility knows or should know that by so failing to give notice the interruptions might result in loss or harm to its consumers.

■ Under the evidence in this case, a jury could have reasonably found that Union Electric could have reasonably anticipated that the steadily deteriorating environmental situation on July 11, 1966, would necessitate the interruption of service to its customers. In fact, the evidence indicated that Union Electric was well aware of the unprecedented demand upon its facilities on the morning of the 11th of July 1966, and as a result thereof at 7:55 A.M., put into operation its "Emergency Load Reduction of Power Curtailment Plan." Furthermore, at 10:00 A.M., 11 July 1966, in recognition of the seriousness of the power drain, Union Electric put into effect phase three and between 10:00 A.M. and 12:30 P.M. contacted its 200 largest industrial customers. Then at 1:47 P.M., pursuant to its emergency plan Union Electric put into effect its involuntary curtailment program. Accordingly, we find that Union Electric knew of the gravity of the situation and that it was well aware that it might have to have an area-wide cessation of power; therefore, we hold that it became a jury question as to whether Union Electric's failure to give a reasonable notice or warning of outages and interruptions of service was reasonably likely to cause harm or property loss to its consumers. It is a jury question as to whether or not the failure to give notice was a breach of that duty.

■ In Part 2 of Union Electric's first contention, it states that to require it to give National notice would constitute discrimination under § 393.130(3). No dis-

crimination is present as the duty to exercise reasonable care is owed to all customers similarly situated. See Humphreys v. Central Kentucky Natural Gas Co., 190 Ky. 733, 229 S.W. 117 (Ky.1920). Here, too, there is no contention that National alone was owed the duty of advance notice, but the duty is owed to all customers in a similar situation.

■ Union Electric contends that its damages are fixed by its "General Rules and Regulations" filed with the Missouri Public Service Commission pursuant to § 393.140(11). Warner v. Southwestern Bell Telephone Co., 428 S.W.2d 596 (Mo.1968). The language of the General Rules and Regulations reads as follows:

> "Company will use reasonable diligence in furnishing an uninterrupted and regular supply of service, but in no case be liable for interruptions . . . in service, except to the extent of a pro rate reduction of the monthly charges."

First, the Warner case involved a telephone company, and was decided with reference to § 392.220, which governs the rate for telephone companies and not § 393.-140(11), which governs the filing rates of electric companies. One distinction is that while § 392.220 is mandatory, § 393.140 leaves it to the Public Service Commission to require rate schedules for electrical companies. In any event, it is not the interruption of service that National is complaining about, but rather the failure to give notice of an interruption of service. The right to interrupt service is granted, but the crucial point is that Union Electric cannot divorce itself from the consequences of its own failure to use ordinary care to avoid harm to its consumers. Next, we take up Union Electric's claim that National's damages were not reasonably attributable to its failure to give notice.

■ The record indicates that there was sufficient evidence available to the jury upon which they could, with a reasonable degree of certainty, fix the amount of

damages flowing from the defendant's breach of his duty, if they found such a breach. Warner v. Southwestern Bell Telephone Co., 428 S.W.2d 596 (Mo.1968); Hargis v. Sample, 306 S.W.2d 564 (Mo. 1957); Mitchell v. Southwestern Bell Tel. Co., 298 S.W.2d 520 (Mo.App.1957); Tnemec Co. v. North Kansas City Develop. Co., 290 S.W.2d 169 (Mo.1956). This evidence included reports from National's store managers which listed: (1) the date and time the power was shut off and when it was restored; (2) estimated product loss (i.e., fresh meat, frozen merchandise, dairy and produce estimated in pounds and dollars); (3) excess labor costs; and (4) estimated loss of sales if the store was forced to close. Moreover, National introduced substantial evidence that if they had been notified they could have avoided the loss.

However, the evidence shows that sometime after two o'clock in the afternoon of July 11, National's maintenance began to receive calls from some of their managers telling them that the power in their stores had been suddenly cut off. Immediately thereafter the supervisor tried unsuccessfully to contact Union Electric's account executive who handled their account. Some time between 3 or 4 o'clock that afternoon he succeeded in reaching the agent in charge who told him that before any areas would be cut off the large customers in such areas would be notified an "hour or two" ahead of time. No such notice was ever received. So, here we would seem to have two separate categories of stores, i.e., those stores whose managers had called in about the cut offs and those stores which suffered damages in reliance upon Union Electric's promise to give notice. As to the first category their damages, if any, would result from the failure to give the general notice, whereas those stores in the second category their damages would be the result of the failure to give the promised notice.

On retrial the jury must determine whether Union Electric was negligent in not giving a general notice and, if so, the damages sustained by National as a proximate cause of that failure. It must also determine whether Union Electric was negligent in not giving specific notice to National after having assured National it would and, if so, what damages National sustained from that breach. It is clear that after 2:00 P.M. National was as aware of the situation as it would have been had a general notice been given, and the proximate cause of its damages thereafter was Union Electric's failure to specifically notify National as it had promised to do.

On retrial National's verdict directing instruction should be drafted along the lines expressed in our opinion. And, if so advised, National may give due consideration to the complaints made by Union Electric to its instruction on this appeal.

Accordingly, the judgment is reversed with directions to the trial court to set aside its judgment and to grant a new trial in accordance with the views expressed herein.

SMITH, P. J., and SIMEONE and KELLY, JJ., concur.