ABBOUD *v.* ARKANSAS POWER & LIGHT COMPANY.

4-6466                                            155 S. W. 2d 584

Opinion delivered November 10, 1941.

*Caviness & George, Ferguson & Madole* and *Caudle & White,* for appellant.

*House, Moses & Holmes, Hays, Wait & Williams, W. P. Strait* and *J. M. Smallwood,* for appellee.

HUMPHREYS, J. This suit was brought by appellant against appellee in the circuit court of Yell county, Danville district, to recover damages in the sum of $5,320 on account of an alleged breach of contract on the part of appellee "to furnish efficient and adequate electric service to efficiently operate a commercial chicken hatching plant in Danville, Arkansas," of the kind and type installed and equipped by her. In her complaint appellant alleged that she installed and equipped the plant on the advice of B. C. Fowles, manager of appellee corporation, and his assurance that appellee corporation would furnish efficient and adequate electric service to efficiently operate the hatchery during the ensuing hatching season; that after the plant was installed and ready for operation appellee, through its said manager, ordered and directed the said equipment or plant be connected with the distribution system of appellee and supervised the manner in which the connection was made and thereafter began to furnish electrical current for the operation of the machines and equipment at the agreed price of three cents per kilowatt hour; that in reliance upon the contract appellant filled and emptied the hatching machines with eggs costing her four cents each in the total number of 95,000 at a total cost of $3,800 during the season beginning January 7, 1937, and ending March 9, 1937; that had the electrical current furnished been adequate, efficient and sufficient she would have made a net profit of $1,400 during the season; that notwithstanding the aforesaid contract and agreement appellee corporation neglected, failed and refused to furnish adequate, efficient and sufficient electrical service, setting out the dates and the hours appellee failed to furnish sufficient current and alleging that as a direct and proximate result of the failure and refusal of the appellee corporation to comply with the terms of its contract and agreement all the eggs were spoiled and became valueless, and that no commercial chicks were produced therefrom and that she sustained $3,800 damage on account of the purchase of eggs, an additional sum of $120 that she paid appellee corporation for service during the period of incubation, and that she lost $1,400 in profits that she would not have

lost had the current and service contracted for been furnished, and that she sustained a total aggregate damage in the sum of $5,320; that all of the damage was the direct and proximate result, failure and refusal of appellee corporation to comply with the contract as aforesaid.

Appellee corporation filed an answer denying each and every material allegation set forth in the complaint of appellant except the allegations specifically admitted. They consisted of allegations that appellant was engaged in the operation of a commercial hatchery and that appellee was a domestic corporation and so forth and so on. In the answer it was denied that B. C. Fowles was general agent or that he had authority, actual or apparent, to enter into the contract alleged or that he induced appellant to install the character of machinery and kind of plant alleged. It was denied that appellant had sustained any damages on account of appellee's failure to furnish efficient and adequate electrical service to efficiently operate the equipment for the ensuing hatching season.

The cause was submitted and at the conclusion of appellant's testimony the court instructed the following verdict:

"Gentlemen of the jury, after hearing all the evidence being introduced by the plaintiff, and the law presented to me by the apt representation on both sides, the court has come to the conclusion that the plaintiff would have to show that Mr. Fowles, as district manager of the Arkansas Power & Light Company, had the authority from the company to enter into a contract to furnish continuous, uninterrupted service, and it being a special contract it would devolve upon her to show that he had that authority, and she has failed to do that. I have prepared the verdict, 'We, the jury, find for the defendant.' One of you can sign that verdict as foreman."

A motion for a new trial was filed and overruled over appellant's objection and a judgment was rendered dismissing her complaint, from which is this appeal.

Appellant introduced testimony tending to sustain all of the allegations of her complaint. So in taking the case away from the jury and instructing a verdict

the court decided questions of fact according to his interpretation of the allegations of the complaint and the evidence in the case. In other words, he found that B. C. Fowles was the manager of the company and that he made a contract with appellant to furnish continuous, uninterrupted service to operate her hatchery, but declared as a matter of law that notwithstanding the fact that B. C. Fowles was the general agent of appellee he had no right to make a contract and bind appellee that was impossible of performance. In other words, it is argued that he could not bind appellee upon a contract to furnish uninterrupted service where the failure to do so was caused by the acts of God, or the public enemy or interruptions in service caused by unforeseen accidents, fires, explosions, strikes, riots, governmental interference, order of any court or judge granted in any *bona fide* adverse legal proceedings or action, or any order of any commission or tribunal having jurisdiction in the premises, or any other act or thing reasonably beyond appellee's control, or for damages occasioned by interruptions necessary to make repairs or changes in appellee's generating, transmission or other equipment.

Appellant argues that the evidence could only bind appellee on contracts usual in the line of business in which appellee was engaged. We do not think that a fair interpretation of the evidence or the provisions of the contract was to require appellee to pay damages to appellant in any event, or to express it differently, that the contract entered into bound appellee to pay appellant damages if it failed to furnish sufficient electrical energy to operate the plant through an act of God or from acts or actions over which appellee had no control. We think a fair interpretation of the testimony is that the purpose and intention of the contract was to require appellee to furnish efficient and sufficient electrical energy in the exercise of ordinary care on its part. At least, taking the allegations of the complaint together with the evidence introduced, the jury would have been warranted in finding that appellee was only bound on the contract in case it was guilty of negligence in furnishing electrical power. Of course, appellee could not contract against its own

negligence in failing to furnish electrical power. One of the issues of fact, to be determined from the allegations in the complaint and from the evidence, was the terms of the agreement and this issue along with the other issues of fact should have been submitted to the jury by the court.

The court erred in taking the issues of fact away from the jury and deciding them or part of them himself.

On account of the error indicated, the judgment is reversed, and the cause is remanded for a new trial.

GRIFFIN SMITH, C. J., and HOLT, J., concur.
McHANEY, J., dissents.

GRIFFIN SMITH, C. J. (concurring). The trial court's error, as shown by the instructed verdict, was in construing the oral contract to be one guaranteeing ". . . continuous, uninterrupted electric service."

Appellant testified that Fowles did not tell her the company could not give current sufficient to operate the hatchery, or that service continuity would be complete. The guarantee was that enough current would be furnished to operate the equipment; and: "He said, 'You go home, lady, and by all means buy this all-electric machine. We will guarantee to furnish enough current, *and continuous current sufficient to operate those machines.*"

It will be observed that the guarantee did not bind the company to supply *continuous* current, but continuous current *sufficient to operate the machines.*

Prior to purchasing the all-electric equipment, appellant had operated a smaller business at Danville, using oil to generate heat, and electricity to produce circulation. Interruptions had rendered the electric service unsatisfactory. The new equipment was installed in 1936, after deficiencies of the old service had been discussed with Fowles. Appellant's testimony that improvements were promised is not disputed. Fowles explained that the line serving Danville also supplied current used in the operation of coal mines. The company, he said, "would take the line from across the river at Dardanelle

Rock and bring it across the bridge,'' bypassing Dardanelle. While there is no testimony this was not done, evidence is abundant that poor service was given. Whether the interruptions were due to negligence, or to circumstances over which the company had no control —that is, conditions which, by the exercise of ordinary care, could not have been avoided—were matters for the jury.

Appellant testified that current was ''off'.' as follows:

January 12 (1937), two hours and forty minutes; January 19, five hours; January 23 (Saturday) service was discontinued at ten o'clock in the evening, ''and stayed off until Sunday, January 24.'' ''Mr. Fowles,'' said appellant, ''called and said the current would be turned on for a short time Monday morning, but it would have to be cut off again to work on the line.'' It was turned on again Monday morning for about fifteen minutes, after which service was not re-established until Monday night about eight o'clock. February 2 current was off thirty minutes; February 9, three hours and fifteen minutes; February 21, one hour and forty-five minutes; February 24, two hours; March 3, three hours at one time, forty-five minutes at another time, and, later, for fifteen minutes. On March 15 it was off two hours.

I think a correct interpretation of Fowles' so-called guarantee is that ''enough current''. had reference to sufficient voltage, amperage, etc.,—that is, energy sufficient to operate the heating units and fans. There does not appear to have been a violation of this phase of the agreement. The term ''continuous current sufficient to operate the machines'' involves maintenance of flow without a break so protracted in point of time as not to interfere with incubation of the eggs or care of the product.

It is true appellant testified she explained to Fowles that the equipment required ''a smooth, uninterrupted current,'' and in explaining consequences of a deficient service she stated that when the temperature rose higher than 100 degrees (due to non-functioning of fans used for circulatory purposes—a contingency which temporarily occurs when current fails) an automatic alarm sounded. An inference might be drawn from this statement that

*any* interruption in the supply of current is fatal to incubation. I think, however, that a more rational construction is that if the current be withheld during a protracted period, then heat already generated *above* 100 degrees (but withheld from the eggs by action of the fans) ascends because it is lighter than cooler air;; and until the generating units have time to cool, such reserve heat increases egg temperatures, causing deterioration or complete loss.

If with knowledge of efficiency required, a public service agency undertakes to meet a particular demand, it must exert all reasonable effort incident to the obligation, even though additional facilities may be needed.

The trial court's instruction discloses that Fowles was appellee's district manager. There is evidence that Danville was within his sphere of supervision. It will not be presumed, as a matter of law, that this manager did not have authority to assure appellant that the line tapped by mines would be rerouted by way of the bridge, thereby insuring better service. If, as appellant says, Fowles urged her to purchase the expensive equipment, promising "continuous current sufficient to operate," then it became a matter of defense for appellee to show that acts over which it had no control prevented fulfillment of the contract, or at least that it exercised reasonable care in repairing its lines and machinery expeditiously when unavoidable interruptions came.

I agree with the trial court that the company cannot be held to the performance of an impossible contract; nor will it be compelled to discharge a service which, in view of all the circumstances and relationships of the parties, is impracticable; for in that event the district manager would have exceeded his authority.

The question, it seems to me, is whether interruption of service over a period of sufficient duration to damage appellant was occasioned by appellee's negligence, or did it come about through operation of forces over which the company had no control. These were matters for the jury.

Mr. Justice HOLT agrees with the views here expressed.