ARKANSAS POWER & LIGHT COMPANY *v.* ABBOUD.

4-6779                                      164 S. W. 2d 1000

Opinion delivered October 19, 1942.

*House, Moses & Holmes; Hays & Wait* and *J. M. Smallwood,* for appellant.

*Ferguson & Madole; Caviness & George* and *Caudle & White,* for appellee.

GRIFFIN SMITH, C. J.   November 10, 1941, in an appeal styled *"Abboud* v. *Arkansas Power & Light Company,"* the trial court's judgment on an instructed verdict was reversed because jury questions were involved. 203 Ark. 6, 155 S. W. 2d 584.   See, also, concurring opinion at page 10 of the Arkansas Reports, and at page 586 Southwestern Reporter.   On retrial judgment was in favor of the plaintiff for $3,999.   The power company has appealed.   Its contention is that most of the service interruptions were occasioned by acts of God, others by agencies over which it had no control, and that due care was exercised.

In August, 1940, plaintiff elected to base her suit upon contract as distinguished from tort.   An amended complaint alleged that in August, 1936, C. B. Fowles, the power company's district manager, advised appellee to purchase all-electric equipment, including units necessary to operate a commercial hatching plant.   Assurance

was said to have been given, which is referred to as a guarantee, that the company would supply adequate electric service to efficiently operate the plant. It was further alleged that, relying upon representations service would be sufficient, appellee (January 5, 1937) began business as Danville Electric Hatchery, the various units having a capacity of 32,000 eggs.[1] Average cost of 95,000 eggs was four cents, or $3,800. Plaintiff's contention is that if continuous current sufficient to operate the machines had been supplied, 66,500 chicks would have hatched, resulting in net profit of $1,400.

Severed service ranged from thirty minutes to forty-six hours. Chickens actually hatched were cripples of very little value. Appellee estimates that sales amounted to $100 or $200.[2]

Power supplied the area involved comes from Sterlington (La.) by way of the company's North Little Rock substation, thence to Morrilton, Russellville, Dardanelle, Ola, and Danville. Appropriate transformation of voltage is made at various points. From transformers at Russellville the step-down is to 13,000 volts for dispatch to Dardanelle. Between Russellville and Dardanelle the service is tapped for use of Bernice Anthracite Coal Mines. The lateral leading from the power company's primary wires to the mines is owned by the coal company and is maintained by it. Switches, with fuse protection, were on a pole set in the coal company's property adjoining the power company's lines. The coal company employed an electrician who was supposed to inspect and repair these switches and the lines from such connections to the mines.

---

[1] January 5, 7, 12, 14, 19, 21, 26, 28; February 2, 4, 9, 11, 16, 18, 23, 25; March 2, 4 and 9, ninety-five thousand eggs were placed in the machines, 5,000 on each date. They were withdrawn January 26, 28; February 2, 4, 9, 11, 16, 18, 23, 25. March 2, 4, 9, 11, 16, 18, 23, 25 and 30.

[2] Periods of service interruption alleged in the complaint were: January 12, 1937, two hours forty minutes; January 19, five hours; January 23, two hours; January 24, twenty-four hours; January 25, eight hours; February 2, thirty minutes; February 9, three hours fifteen minutes; February 21, one hour forty-five minutes; February 24, two hours; March 3, four hours; March 15, two hours.

The interruption of January 19, according to a power company witness, resulted from the act of a coal company agent who "used a heavy fuse, and it wouldn't strip out." It seems, however, that an oversize fuse was not the cause, because a power company lineman testified that ". ... somebody at the mine had fused the switch with copper wire—made it solid." A dog had crawled into the mine company's substation. It then got into the conductor and caused a short-circuit, with resulting interruption of five hours at Danville.

It is in evidence that the power company had been gradually improving its service during the past few years. Some of the property was acquired prior to 1916. Appellee, in August, 1936, made her contract for electricity shortly after she had returned from a convention in Kansas City, where an inspection of electrically-heated incubators and brooders had been made. Appellant's answer denies any special contract to supply continuous current sufficient to operate machines such as those Mrs. Abboud says were being discussed. Fowles testified appellee came with catalogues and other printed matter illustrating units she desired, and that she asked whether the company's lines to and equipment at Danville [were sufficient] ". . . to operate the machines plaintiff desired to install." It is conceded that Fowles ". . . informed plaintiff the current furnished by defendant corporation's lines at Danville was sufficient to operate the machines such as plaintiff contemplated installing."

A construction of this language in the concurring opinion of November, 1941, was that the expression "enough current," testified by Mrs. Abboud as having been used by Fowles, had reference to sufficient voltage, amperage, etc.,—that is, the energy sufficient to operate heating units and fans. It was then said that the term "continuous current sufficient to operate the machines" contemplated maintenance of an unbroken flow; or, if broken, duration should not be so protracted as to interfere with incubation of eggs or care of the product.

T. H. Abboud, appellee's husband, testified he was present when appellee discussed their needs with Fowles.

They had "gone over" past troubles—such as interruption of power—and Fowles is represented as having said: "You go on back, lady. The Arkansas Power & Light Company is a service organization. We will take care of your needs." This was in response to appellee's statement that "We've got to know if we are going to have this current." Appellee's further testimony was that Fowles agreed ". . . to furnish sufficient, adequate current, continuous current, to operate the hatchery."

A letter written by the power company April 7, 1937, was received by appellee in response to complaints of bad service. It is printed in the margin.[3]

Although in the complaint appellee stated that service interruption January 23 was two hours, in her testimony the period is fixed as forty-six hours. Her statement was that the current went off at ten o'clock Saturday night; that it remained "dead" that night and all day Sunday, ". . . and came on Monday morning for a little while."

The law as declared in the former appeal is that the contract did not require the defendant to compensate damages if an act of God prevented it from furnishing sufficient energy to operate the plant, or if the trouble was traceable to acts over which the company had no control. . . . "It was only bound on the contract in case it was guilty of negligence in furnishing electrical power," says the opinion.

The first interruption complained of occurred January 12. Five thousand eggs had been placed January 5,

[3] "Referring to our conversation last night regarding the interruption of our service for approximately 30 minutes which I understand inconvenienced and endangered the hatching of eggs in your incubator. You were also interrupted two or three days during the recent sleet storm, and I would suggest that you put in some other form of heating as an emergency. I understand that there are several types of incubator heating for emergency use. We cannot any more guarantee continuous service than you can guarantee the hatching of 1,000 chicks from 1,000 eggs. Ninety per cent of our interruptions are caused by the elements over which we have no control. We make every effort to give the best of service possible, and always get our men out during any kind of weather to repair the lines and renew service. Our interruption last night was caused by lightning striking an insulator on our high line below Pottsville."

and an equal number January 7. The break covered a period of two hours and forty minutes, but on the same day five thousand additional eggs were put in the machines. Whether this act occurred before, after, or during the period of interruption is not clear. It is argued by appellant that appellee was negligent in continuing to deposit eggs in the machines after the contract had been breached. Conversely, it should be remembered that appellee had invested approximately $5,000 in electrical equipment, relying, as she says, upon Fowle's assurance that sufficient current would be supplied.

Publisher George Upton of Dardanelle Post-Dispatch, testified that during early January, 1937, severe weather occurred, with ice on trees, streets, and elsewhere. Recurrences were at intervals of a week or ten days:—"Foliage and ground were covered and glazed with ice: trees broke—practically all of them, as I recall. . . . This would have happened [according to my newspaper files] the week previous to January 21, [because the item refers to] 'last week'."

Appellee insists this testimony does not connect the interruption of January 12 with the storm. However, J. M. Patterson, weather observer at Danville for ten years, testifying from his records, found the following: "January 9, ice bending trees; January 10, ice still bending trees; January 11, ice on trees; January 12, sprinkle." Patterson then stated unequivocally that "During January sleet and ice were freezing on the timber. [Conditions] were the severest I have any recollection of in this part of the country. . . . Ice and sleet [caused the interruption of two hours and forty minutes at Danville complained of by Mrs. Abboud]. . . . I got my first call—my first trouble—developed about four o'clock that afternoon at Belleville. . . . Limbs broke off [of trees] and fell on our lines."[4]

The next interruption occurred January 19, and has been attributed to the coal company switch.

---

[4] Patterson gave his profession as "railroading"—a section foreman.

814

Appellee says power was off forty-six hours, beginning January 23. These breaks are accounted for by appellant with testimony by its linemen, and by an excerpt from Dardanelle Post-Dispatch, which was read into the record by its publisher. The newspaper reference is shown in the footnote.[5]

January 23, 24 and 25, were Saturday, Sunday, and Monday. These days corresponded with periods mentioned in the Post-Dispatch article. Editor Upton testified that "Every machine in my office is electrically equipped. I was vitally interested and went out to see what they were doing." Employes of the power company, he said, were engaged making repairs. Telephone lines were also down. His final statement is:—"The sleet storm was all over the country."

There is no explanation of the thirty-minute interruption of February 2.

Appellant says the undisputed evidence is that the break of February 9 (three hours and fifteen minutes) was caused when lightning broke a porcelain insulator at Morrilton, and that a blown fuse was responsible for the interruption of February 21, lasting an hour and forty-five minutes.

The defense is that lightning struck a transformer February 24 and occasioned the two-hour stoppage. While lightning as a cause may be inferred from the testimony of Henry Mabry, his exact statement is that ". . . trouble developed in the substation [at Danville]—burned the lightning arrester off the distribution system." The "bad" transformer was disconnected and two good ones were utilized ". . . in order to give them light temporarily. The next morning we had to interrupt the service to change the transformers." A new transformer was sent from Russellville. The witness

[5] [Headline]: "Freezing Rain Does Much Local Damage." The text is: "The beautiful shade trees of Dardanelle, a feature of the city that is noted and admired by every visitor, suffered heavy damage last Friday, Saturday and Sunday, by the freezing rain and sleet storm that encrusted every branch and twig with a heavy coating of ice. Weighed beyond the breaking point, few trees escaped the loss of at least several limbs, and some were entirely destroyed. Sunday afternoon most of the streets of the city were blocked to traffic by dense masses of ice-covered trees."

testified that the two units temporarily connected would have burned out if the overload had continued.

Trouble March 3 was incidental to repairs to poles and lines, ". . . these repairs, of course, having been necessary as a result of the severe sleet storms during January." One period of stoppage was three hours and forty-five minutes, another was for fifteen minutes.

The final interruption (two hours) occurred March 15, when poles supporting wires carrying 33,000 volts were replaced. It was necessary that the current be shut off because the line ". . . couldn't be handled with 'hot sticks'."

## OTHER FACTS—AND OPINION.

Appellee testified she was told the power service from Russellville to Dardanelle would be improved. At the former hearing she testified that Fowles told her the company would reroute the line where it crossed the Arkansas river. At the time in question the stream was spanned from a tower on the north side to anchorage on Dardanelle Rock on the south side. In consequence, primary wires were strung along Front street in Dardanelle in close proximity to shade trees. Subsequent to appellee's losses the wires were attached to the bridge and brought across the river. Inferentially it is insisted that if this had been done between August, 1936, when appellee made her contract, and January, 1937, when the sleet storms occurred, falling limbs would not have interrupted service. It is in evidence that ice and sleet more than an inch in thickness encrusted the wires, adding materially to their weight and to the tension under which they were normally operated.

There is nothing in the evidence to show that the sleet storms would not have damaged the lines if the bridge-route had been utilized. Testimony is convincing that communication was paralyzed by extraordinary conditions. What acts of precaution the power company could have adopted to guard against the unusual stress is not shown; and, of course, an assumption that the weather's fury would have been felt at one place, but not

at another, is speculative. It is not denied that limbs on Front street trees were kept trimmed as far back as property-owners would permit. No break occurred in the power company's river span.

As we have formerly shown, the first batch of 5,000 eggs was "set" January 5, and a second lot of 5,000 was placed January 7. January 12, when the first trouble came, appellee deposited a third lot of 5,000 eggs. Thereafter eggs were put in the machines, regardless of difficulties that were being experienced. While the shutdowns of January 12, 23, 24 and 25, were undoubtedly caused by natural agencies over which the power company had no control, and could not successfully guard against, the interruption of January 19 would not have occurred if appropriate fuses had been used in the coal company's switch. The power company depended upon the coal company's electrician for maintenance of a system so vitally tied in with the Russellville-Dardanelle lines that use of copper wire as substitute for fuses caused a short-circuit and consequent interruption for five hours. There appears to have been a want of inspection by the power company, or a delegation of authority carelessly exercised, or an improper installation where the mine company's wires tapped the power company's service. In either case liability would attach.

Inclusive of January 19, 25,000 eggs had been placed in appellee's machines. To what extent five hours without heat affected them, or how badly these eggs and an additional 5,000 placed January 21 were damaged by the interruptions of January 23, 24, and 25, is obscure. The next "setting" was January 26, one day after protracted trouble had been experienced on account of sleet storms.

Apportionment of damages to 30,000 eggs as a result of interruptions due to negligence January 19 when either 20,000 or 25,000 were in the machines,[6] and to acts of God January 23, 24, and 25, is impossible. It is difficult to unscramble an egg; nor has anyone suggested a

[6] The number would be 20,000 if power was shut off January 19 before 5,000 eggs were placed that day, or 25,000 if the shut-down occurred after the deposits had been made. Mrs. Abboud's testimony does not clarify this point.

practical way to place Humpty-Dumpty back on the wall in an unimpaired condition.

If we disregard the thirty-minute interruption of February 2 as perhaps of little consequence, the next obstacle confronting the power company is satisfactory explanation of why three hours and fifteen minutes were required to repair a broken insulator at Morrilton February 9, or why a fuse was blown February 21, with resulting interruption of an hour and forty-five minutes. Accepting as true the testimony that trouble developed in the substation at Danville February 24 and that a lightning-arrester was burned from the distribution system, it is not shown, except by inference, that lightning damaged the arrester; or, if such were the facts, the power company did not discharge the burden placed upon it of showing that the equipment had been properly installed.

Mabry's testimony is that when one of three transformers was damaged at Danville February 24, two others were connected and made to carry the load. The following morning they were overheating; therefore service was discontinued until a third transformer could be installed. The jury may have thought that if the two transformers carried the burden placed upon them during the night, they were not insufficient for daytime service when most of the lights were off and a much smaller load was in prospect. Also, the jury may have believed, in the absence of convincing testimony to the contrary, that cumulative periods of four hours March 3 to repair poles could have been lessened if temporary wires had been strung in order to prevent long disconnections.

The overlapping periods during which power was not available, considered in relation to the intervals from January 5 to March 9 when eggs were placed in machines; the percentage of damage caused by interruptions attributable to negligence in comparison to loss resulting from the acts of God—these are matters impossible of accurate computation. They are baffling alike to lay-witness, expert, juror, and judge.

Of one thing we are certain: there was substantial evidence that some of the trouble complained of was caused by external forces not within the power company's control, and in respect of which there is no showing the company was negligent in not anticipating it might occur.

The judgment can not stand for an amount in excess of $1,999.50, or one-half. If appellee will enter a remittitur of $1,999.50 within fifteen days, the judgment will be affirmed; otherwise the cause will be remanded for a new trial.